Okay, we've got a lot of advocates for one case, but you want to tell us, so we'll have straight in our mind what the split is here, if there's a split according to issues? Is that what, okay. Yes, there is. Good morning. Good morning, sorry. May it please the Court. I'm David Schwartz with Thompson Hine. I'm here with my colleague, Michelle Lee. I'm gonna have six minutes in this affirmative presentation. She'll have four minutes. I'll be, she'll be addressing the bona fide sale issue only, and I'll be addressing the other issues. Please proceed. May it please the Court. Again, I'm David Schwartz, Thompson Hine. I'm here with my colleague, Michelle Lee. We're here to represent the Appellant Geospecialty Chemicals, and asking this panel to determine that the CIT's decision in this matter was not supported by substantial evidence and not in accordance with law, as to all issues we've raised on appeal. All the issues on appeal depend on whether Commerce has substantial evidence to support each of its findings. Evidence that a reasonable mind might accept is adequate to support a conclusion. This requires Commerce to examine the record. Can you clarify for me, because you toss out the regular standard review of substantial evidence and not in accordance with law, but our standard review on those two are very different, obviously. One's de novo, one's substantial evidence. Is there anything in here that's legal, or is this all substantial evidence? For us, the legal standard to follow is whether there's a rational connection between the facts and the choice made. Okay, but that's a different standard altogether, too, and that's another highly deferential. I'm just trying to get at, do you have a legal argument that we get a review de novo? I didn't see one, but if you think there's something purely legal that we're gonna review de novo, tell me, otherwise I'll proceed and assume that all of your arguments are either under substantial evidence or arbitrary and capricious. That's correct. Okay. First, I'd like to address the byproduct offset issue. Byproduct offset, as you know, is an adjustment to normal value. A party may receive a byproduct offset if it satisfies its burden of providing relevant information, showing that there was a quantity of byproduct generated during the period of review, and that the byproduct had commercial value. Bao Ding only provided evidence of its byproduct sales and its inventory records of the quantities sold through inventory outslips. Bao Ding admitted that it failed to track the quantity of its byproducts generated during the POR. American Tugular, in American Tugular Products, where Judge Lurie wrote the opinion back in 2017. Mr. Schwartz, whether I wrote the opinion doesn't matter. We're speaking to the court, and may I also say you're just reading from the text very fast. It might be more useful for you to just state to us the key points of error from the trial court. I will, Your Honor. The case in American Tugular Products pointed out that commerce reason for denying a byproduct offset was because there was no proof that the byproduct was generated, was made during the POR. The CIT in the underlying proceeding for American Tugular Product also pointed out that the existence of a yield loss ratio alone does not replace the requirement of showing that the byproduct must be generated from the production of the goods during the POR. Here, we don't have any proof that the byproduct was generated during the POR. The CIT provided support, which commerce didn't provide in the underlying decision, that the Baudin demonstrated that there was a yield loss ratio that demonstrated that what they sold matched up with what they produced of the subject merchandise. However, there's no record of what was sold of the byproduct was, in fact, generated during the POR. We don't know whether or not that byproduct was in inventory prior to the POR. We don't even know if it was purchased from a third party and placed in inventory prior to the POR. There is no record that what was sold as a byproduct was, in fact, generated during the POR. That's the key factual issue here. And there's nothing. So the factual issue is, I mean, the board, the commerce relied on, and this is what the CIT said, I guess, it did provide inventory records to support the quantity sold. So the question is, is there substantial evidence to support or to overturn, to support the commerce's weighing of what the inventory records do or do not support? Right, that's pretty in the weeds, right, for an appellate court on review, is it not? Well, I think it's clear cut in that all we have in terms of inventory records are outslips. And the outslips just show what was taken out of inventory. It doesn't show when the byproducts went into inventory. And that's the key issue. That's one of the key issues that determines whether or not a byproduct offset can be granted is whether or not the product was generated during the period of review. We have no information, commerce relies on no information to demonstrate that the byproduct was generated during the POR. The inventory record that you reference, again, is an outslip. It could have been sitting in inventory for years. We have no record that it was actually generated during the POR and put in inventory during the POR. If I may move on, alternatively, if the court determines that a byproduct offset should still be granted, we want to point out that the recalculation in the remand redetermination by commerce is wrong and for no other reason needs to be remanded and to be recalculated. Did you make that argument to the CIT after remand? We didn't have the opportunity. After the remand redetermination, the first time we had the opportunity to even argue it would be here before you all. But why didn't you include it in your comments on the remand redetermination? Well, we had no reason to predict that they were gonna be making a mistake. Wait, so after commerce made the new determination on remand, you had no opportunity, once it went back up to the CIT, to suggest error or anything like that? That's our position. That seems really odd. I mean, so the CIT just rubber-stamped commerce as remand determination without any input from the parties? That's my recollection. Wait a minute. Just to follow up, you made comments on the remand determination. Wasn't that following the calculation of the offset cap? That's not our recollection, no. All right, well, we can ask the other side if they have a different view. I'd like to move on to a second issue, and that has to do with the three-part product comparability test that the department uses. I'll just alert you. You're already in your either rebuttal time or in the friends time, so just to alert you to that. Okay, I'll yield the rest of my time to my colleague. May I please, the court, here I'm here to address only the bonafide issue. So for this review, Bowdoin had already been in the U.S. market for 10 years. It had a long-standing record of shipment volume, shipment price, and regular customers. Bowdoin single-selling this review, however, departed from its last 10 years of U.S. sales. It was sold at an alarmingly low amount compared to volumes in each of the last 10 years. Its delivery price inclusive of 454% anti-dominant. What is it that they did, Commerce CIT party, that wasn't consistent with sort of the benchmarks that Commerce uses? I mean, this was, this may have been a little unusual, but it was, they look at the various factors, and one of them is an arm's-length transaction, and they concluded this was. So what can you point to is the error here in terms of the consideration? Are you saying you could never use this because it was different than what they did the other two years, 10 years? No, it was that the text here is that, so the Commerce can look into a number of factors. I'll speak to the commercial realities here. All we are pointing here is that records show that this cell doesn't reflect, is not representative of any commercial reasonableness, which Commerce failed to address in both in each of the quantity factor, price factor, profit factor, and I understand that Commerce decision that it was an arm's-length transaction, that component's conclusions actually was premised on its erroneous findings on both the price and profit factors, which I'm going to address one by one here. So in the last 10 years, when it departed from the last 10 years of U.S. sales, which is important here because the test here is that, and there is no dispute in this case, that if the way of evidence indicates a cell, if a cell is not typical of normal business practices or artificially structured to be commercially unreasonable, then it is not bona fide, and this is what we have here. The last 10 years of balding sales reflect balding's normal business practices, and that's why it's important that balding's single cell here departed from its last 10 years sales reflects that it's not typical of normal business practices, and the term that Commerce and CIT both agreed on is that this cell is not historically typical. The text is not whether it's historically typical. It's whether it's typical of normal business practices, and normal by the dictionary, the Cambridge dictionary, means that it's usual or ordinary sales. So it is not rational for Commerce to bypass the last 10 years normal business of balding and just rely on a test cell 10 years ago when balding established its own margin and just began to enter the U.S. market. Is this all a question of fact? It is a question of fact. So we do not disagree that the standard here is, that the Commerce decision is not supported by substantial evidence, but what we are saying here is that Commerce did not provide a rational explanation between the choices made and the facts that excited. In particularly, when Commerce, many of the factors that Commerce find was not implicating the commercial reality here, which is the 454% anti-dumping duties. The importer, i.e. the customer of balding, had to pay upon entry. So that's another issue. That's a separate issue, which is whether or not the numbers we were looking at should have included the duties from the previous years. It is not another. Everybody on the other side said no, those numbers should not include those previous duties. Am I understanding what the state of the record is? Well, in fact, that standard is not what Commerce said, not what the court said. So the inclusion of the anti-dumping duties is actually what the other side said, they never include. So Commerce in its decision, they say we excluded duties because we do not include duties in our price analysis without referencing any precedent. It was unclear what price analysis Commerce was referencing in its decision memorandum. But regardless, that is not Commerce practicing either the bona fide sales price analysis or in its dumping calculation. The government argues, I think, on this particular point, that the argument is waived and it wasn't, that the argument is waived, that it wasn't raised below. Is it your position that it was, this argument was raised below? We disagree with that because the government cited to Nova Steel. In Nova Steel, it's different because in that case, the party who waived the argument because they did not, they raised an entire new issue. Here we are arguing some interdependent factors analysis which cannot be separated from one or the other. Well, if the argument is that the numbers were wrong on the question of whether or not you should use the existing anti-dumping duties when you're looking at the numbers, was that argument made below? I mean, the same disagreement you have now with the way they did it existed below. Did you make that argument below that it's not consistent with practice or existing law to calculate that way? So even the government here admits that we made a similar argument. And they never argue that we exhausted our administrative remedies because we made the argument. Because we made a similar argument that the price is abrasionally high after inclusion of the anti-dumping duties, abrasionally low without including the anti-dumping duties. And that also affects the profit analysis. And that is a show in the appendix in our case brief before commerce. While you're into your rebuttal, I'm not sure we've lost a little. I've lost track of exactly how much time. But why don't we hear from the other side and use their remittance of time. Okay. Thank you. Good morning, your honors. May it please the court. Josh Carlin on behalf of the United States in this proceeding. And I'll seek to take the issues in the order they were raised by the appellants. As a general matter, this court should affirm each of the four determinations by the Department of Commerce that are on appeal here because each is supported by substantial evidence and otherwise in accordance with law. We agree that these are purely factual matters. And in that sense, there's an extremely deferential standard. And courts have continually recognized that quote unquote mere disagreement with the agency's determination is not a basis for return. Well, let me ask you about this bonafide sale issue. Is there some requirement in the standards? And I know there are a bunch of standards and you weigh all of them. But isn't a determination, doesn't a determination of whether it was a bonafide sale involve some sort of look back into the historical customers and historical sales, et cetera, et cetera? And if that's one of the factors or what it is you should do, I'm a little, I find it a little questionable this arm's length transaction thing because it seems like, yeah, maybe it is an arm's length transaction as to how you define that. But this seemed like a different kind of transaction than anything that had been done historically. And is that not an appropriate factor for a bonafide sale? Your Honor, I think Your Honor is correct that as part of the totality of the circumstances test, Commerce does look at exactly those type of issues. And I think it's ultimately reflected in the party's briefing on the quantity issue. Commerce looked back at recent sales. It did not fail to take account of the fact that the appellants here argued that there were a lot larger sales in the past decade or so. And the purchaser in this was a single purchaser who was kind of a mom and pop store operating out of a personal home. And this was the only product that he had ever purchased. I mean, this is quite an unusual sale. I don't think that's quite correct. I think that they had a pre-existing business relationship. But the context here is that the importing had effectively shut down because of this enormously high cash deposit duty rate. And so there was evidence of more recent sales. And Commerce also looked back to what it considered correctly, by the way, an analogous circumstance that occurred in the 2003-2004 Administrative Review, which was this importer Baudin's attempt to enter the market for the first time and establish its rate, which is an analogous context to what was going on here when sales had shut down and it was looking to re-enter the market and establish its rate. And so Commerce, in looking at that, and all of this evidence was on the record, it didn't fail to consider what Gio argued, but it said, in these circumstances, it's a commercially reasonable quantity for them to make a single sale in order to establish a rate. Not a lot of importers are going to want to do 10,000-ton imports at a 450% cash deposit rate. And there was, on top of the fact that they had done this size sale before in similar circumstance, there was additional record evidence that we discussed at page 33 of our brief from both Baudin and its importer discussing why this size sale was a commercially reasonable sale in the circumstances. I have the record sites for that. Again, we cited these quotes at page 33 of our brief. It's page 11941 of the record, also at 7080 of the record, and 12011 of the record. And just to paraphrase what's being said there, they're all essentially saying, look, in this market under these circumstances, it's not feasible for us to be bringing in large quantities of glycine. We want to sell in the United States. We want to show that we are not dumping, and so we're going to make a single sale akin to the type of test sale. What about the use of booty's financial ratio? The compound here is glycine. It's an amino acid. Booty doesn't make amino acids. That's correct. Booty does not make amino acids. But what Commerce is looking for in choosing a financial statement is a manufacturer who has essentially a comparable or similar process. And so looking at the record here, Commerce determined that booty's products and process, which are like Baudin, food additives and other chemicals to be added to foods, like sweeteners to be added to foods and pharmaceuticals, are considerably more similar to what Baudin does than the three pharmaceutical companies that the appellants offered who have kind of highly advanced, high-value products. And even though booty does not produce amino acids, it is producing very similar products under a very similar manufacturing process. Is that a facts question? It's absolutely a facts question. And Commerce here evaluated the information about the production process that was listed in the booty financial statement, indicating, first of all, that a large, I think the trial court quoted at least a third of its production were of sweeteners that are of the same, essentially, variety as glycine. There's an issue that I don't think Your Honor mentioned, but it gets to Your Honor's point. There's an issue in the briefing about, they say, well, booty's largest product is tapioca starch, and that doesn't involve chemical reactions. And we say in response to that, and we quoted record evidence to this effect, that actually Baudin itself said that most of its production was of food-grade glycine rather than technical-grade glycine, and the process for food-grade glycine as well does not involve chemical reactions. It involves heating. What about the failure to update the value of the ammonium chloride offset resulting from the change in the form of ammonia? Right, so on both of these issues, because I know our time is short, I'm gonna get into the weeds, but I can tell you at a headline level, the arguments that appellants raise on both of these issues, both say, hey, Commerce in the 2010-2011 review did something that is consistent with what we're asking for here. And the punchline from the headline is that in two separate decisions, those determinations were challenged. Both were remanded, and on remand in both cases, Commerce decided the opposite and did the same thing that it did in this review here. So in particular, on the liquid ammonia issue, Commerce went back and looked at the record and said, in fact, actually, this stuff really is anhydrous ammonia, not the aqueous ammonia that plaintiffs argue. Similarly, in this Baoding-Menton case, by the way, neither of these decisions have been appealed, and in fact, on the liquid ammonia issue, GEO didn't even comment, and essentially acquiesced to the decision. But first of all, I know it's not controlling authority, but there's an extremely persuasive analysis from the trial court at pages 1340 to 1345 cited in our brief about why these pharmaceutical companies' production process is not at all like Baoding's production process. And in that case, because it didn't even have something as similar as booty, Commerce settled on, rather than the pharmaceutical companies, a producer of urea, which is even further, maybe different. The regulation here requires not identical, but comparable. So Commerce- Could you address the byproduct recalculation point? Sure. I think you said that you thought that was waived. Your friend said they didn't have an opportunity to raise that below, which frankly seems kind of odd to me. I thought that at least at the agency stage, you had an opportunity to comment on the remand results, even if the trial court didn't invite further briefing. That's correct. We disagree with a couple of things that the appellant said in their remarks on that issue. Dealing with the waiver issue first, yes, they had opportunities. And as far as we're concerned, we outlined two or three opportunities, the most significant of which are, first of all, yes, of course, there's the trial court. There was remand comments briefing before the trial court. But even before that, before the Department of Commerce, as your honors well know, the way these remands work is that the Department of Commerce issues a draft remand, a preliminary result of the remand, and then the parties have an opportunity to comment on that draft remand results before the final. And that draft remand result- Did that draft remand result, that included the switch from the one type of ammonia to another, which should have implicated the calculation issue? That's precisely right. We confirmed that during plaintiff's remarks. And that document starts at page 7581, I'm sorry, 7531 of the administrative record. And so they had multiple opportunities. I mean, frankly, given the advocacy for the anhydrous ammonia, they really had an opportunity even in the original proceedings before Congress. But we don't need to go there. This court's decision in Nanyang, which collected a number of cases, talks about how arguments are waived under those circumstances, and that's precisely what's going on here. We also disagreed with one fact- Can I ask my question? If you had done the recalculation, do you think it would have made any difference in the results here? Would it have increased normal value? Because it has not been presented to Congress in any way, shape, or form, I just cannot, I can't speculate. There's one important piece of evidence that we need to cite here. We disagreed with appellant's arguments that it's not accurate to say that the evidence supporting the byproduct offset was just sales or inventory outslips. In particular, commerce, the key evidence on this appears at pages 88.15 to 88.16 of the record. That's a narrative, and the accompanying exhibits are at pages 88.38 to 88.42 of the record. Those documents are where Baojing documented, not its sales, but its production of byproducts during the period of review. And so, the claim on this issue is not just that this evidence doesn't exist, but that when the trial court cited this evidence, it was citing something that commerce had never cited before, and we disagree with that as well. Commerce cited the evidence in its issues and decision memorandum at pages 74.24 of note 40, which is a very long footnote, but it kind of catalogs a lot of the evidence, including this evidence, as well as 74.25, note 49. I know that was a lot of appendix page numbers, but to step back, what that evidence signifies is that what Baojing explains, and what commerce accepted reasonably, is that even though Baojing didn't keep production records, the production of byproducts as a result of the chemical reactions involved in glycine is a matter of chemical formulas and mathematical determination. And so, rather than estimating or speculation, it's a matter of math that when you produce glycine, here's the amount of byproduct you get. Baojing provided documentation that commerce ultimately found sufficient to say, yes, we produced this amount of glycine during the review, and yes, we also sold off the glycine during the review. I see my time is running short. We've cited, I think, in significant detail all of the evidence on the byproduct issue in our brief, including the inventory outslips and the customer lists, and so on and so forth. But at the end of the day, commerce looked at this evidence and found it reasonable that this byproduct was both produced and sold.  to suggest that this was somehow to be true. It was taken out from inventory at an earlier period or something like that. And that's the type of determination that this court leaves to the expert fact finder, which is commerce. Mere disagreement with that kind of weighing of the record evidence is not an appropriate basis to overturn commerce's determination. Thank you. Thank you. Thank you. Hello, may it please the court. I'm Ron Whistler with the law firm of Fox Rothschild, and I represent Ba-Ding Ma-Kong. I'm only here to discuss the ammonia issue, the anhydrous ammonia issue. And in our view, the administrative record clearly supports the commerce's decision that the company used anhydrous ammonia and not ammonia in aqueous solution. The briefing provided the precise pages where we provided this information. It was in the section D, the initial section D response. We provided the chemical formula, which is NH3 for ammonia. We provided the purity level, which was 99.8%. And these are consistent with anhydrous ammonia. Yeah, with anhydrous ammonia. And aqueous ammonia has a different chemical formula. And obviously, since it's mixed with water, it's of a low purity. So the administrative record is clear. Aqueous ammonia is ammonium hydroxide. Yes. Well, N-H, N-A-O. N-H-O-R-O-H. O-H, yeah. So it's a different chemical, different chemical formula, different purity. So I think the administrative record is pretty clear about that. And just the second point I want to make, Appellant's argument basically is that in the 2010-2011 case, the Department of Commerce found that Baudin used aqueous ammonia. However, the 2010-2011 case was on appeal. And subsequent to the initial decision in this case, the court came out with a determination and determined that, in fact, Baudin-Menteng did use anhydrous ammonia in the previous review. Okay, thank you. Thank you. Your Honor, David Schwartz for the Appellant Jail Specialty Chemicals. My colleague, Michelle Lee, will be addressing the waiver of the recalculation for the byproduct offset, and she will also be addressing the bona fide suit. I know you wanted her to address it, but since your name is on the letter, you did file a comment on the draft remand results, didn't you? If my name is on that letter, then I did file a comment. Do you have the appendix? It's 7556. I don't, I mean, you don't have the appendix? I have it at my desk. I don't have it. Can I allow my colleague to address that? Sure. Because there are a couple other issues. I mean, it's a little more appropriate for you to do it since you signed the letter, but sure. Okay. I want to address first the three-part test for the product comparability issue. We find that it's unreasonable because there is no rational connection between the facts and the choice. The department, in the end, chose booty. Booty, to be clear, is a tapioca starch manufacturer. Two-thirds of its production is devoted to that. It's not even a chemical. The point that the government made was that food grade glycine is not produced from a chemical reaction. Of course it's produced from a chemical reaction. There's plenty of information on the record demonstrating that it's produced from a chemical reaction between MCAA and liquid ammonia. The point here is, factually, the department, when they applied the three-part test, took such wide latitude with the application of the three-part test to render it almost meaningless. They're supposed to look at the physical characteristics and uses of production processes. Well, booty does a lot of tapioca work. Doesn't it also run chemical, carry out chemical reactions? I don't believe the segment involving tapioca starch involves chemical reactions. In other parts of its business. There is less than one-third of the business that does involve a product involving chemical reactions. Well, one-third is substantial. Well, I guess I would respectfully disagree. One-third is less than two-thirds, and it's less than half. And I would demonstrate that when you're looking at companies that we had on the record that, in fact, the department had used in the past and other prior proceedings that make, actually, amines and amino acids used in pharmaceutical products, that that's much more comparable. Any reasonable person would say that's much more comparable to glycine. In fact, glycine, to be clear, is not only amino acid that can be used in pharmaceutical products. Glycine actually can be used as a pharmaceutical end product, and that's on the record as well. So to say that it takes a great stretch of imagination to say that the booty, the product line, which is primarily tapioca starch, is in any way comparable, I think strains is quite a stretch indeed. I did want to just address the issue regarding liquid ammonia. I just simply wanted to point out that the only two times that the government has ever verified on site Baoding, they found both times that it was aqueous ammonia and not anhydrous ammonia, regardless of what the legal reasons might have been for the ammonia value to be overturned. As a factual record, the only time Congress has entered the premises at Baoding in review 2003, 2004 review, and the 2010, 2011 review, both times, those only times, they came away saying that the liquid ammonia input is in fact aqueous ammonia. Thank you. Michelle. Your Honor, first I want to address the labor argument really quick. So my friend, our friend, just saying that we do have an opportunity, and he explained the process. There's a final draft, the remand draft results, and Mr. Schwartz commented on it, and then they got the remand redetermination out. And the remand only were limited to two issues, which did not include the bi-product offset issue. So Congress did not make a surrogate value recalculation until its remand redetermination in the spreadsheet. So that was not the... Didn't the remand results and the draft remand results, isn't that where they changed from the one chemical compound to the other? Yes. Right, so if you had an argument that that change, even though the bi-product wasn't raised, if you had an argument that that change would have required a recalculation in the bi-product, why weren't you required to exhaust it with Commerce? Because we assume when they change the liquid ammonia surrogate value, they would change everything. But that's precisely what you need to exhaust. If you're making that assumption and they didn't do it, you need to tell them you've got to do this for everything. Your Honor, we respectfully disagreed. Our hands are tied to only the two only remand issues. So that's why our comment's only addressing the two remand issues. And then I want to, and in fact, the spreadsheet where the surrogate values recalculation that reflects the new calculation was not even issued until the remand redetermination. So we did not have any opportunity to see the mistake from Commerce. And it's not our duty to expect every single, to exhaust every single possible potential mistake from Commerce side. That's my argument. And I want to just go ahead and address one point that our friend made that regarding the bonafide issue. He mentioned, so Mr., so Josh mentioned that page 33 of the brief mentioned a lot of evidence about why doubting the small volume for the single cell during the peer review. That was a post hoc justification. None of those record evidence have been cited and analyzed by Commerce when they made the decision. And also Commerce, there are plenty of fallacies in Commerce reasoning in the bonafide issue. Commerce, so I think our friend tried to raise up that it's okay to make a test cell to determine the margin. There's no commercial justification for that. Even say, even here, we treat it as a purported test cell. So the CIT, the lower court has made it clear in Hebei Niu Donghua that even under the test cell, Commerce should not overlook any other evidence that suggests that non-commercial reasonableness here. And I also want to point to. Over your time, so we'll take one final comment. Okay, there's one final comment, which is that the motive for Baodeng to make the cell to increase, to decrease its anti-dumping duty deposit rate in this review is explicit. And actually Baodeng is the person who request the review. So Commerce, CIT actually made it really clear, and I'm going to read it again here, is that. Well, why don't you give us the CIT, you do not need to read it. I assume the CIT is in your brief. So the CIT will be Hebei Niu Donghua at the case at 1342. Thank you. We thank both sides for cases submitted. That concludes our proceedings this morning. All rise. The honorable court is adjourned from today to today.